IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

| | |
|---|---|
| JEREMIAH GROVES, | CV 10-101-BLG-RFC-CSO |
| Plaintiff, | |
| vs. | **ORDER**<br>**and FINDINGS AND**<br>**RECOMMENDATIONS OF**<br>**U.S. MAGISTRATE JUDGE** |
| OFFICER JONATHAN CROFT,<br>OFFICER JEREMY NEIBAUER,<br>and the CITY OF RED LODGE,<br>MONTANA, | |
| Defendants. | |

## I.   INTRODUCTION

Plaintiff Jeremiah Groves (Groves) claims that police officers Jonathan Croft (Croft) and Jeremy Neibauer (Neibauer), along with the City of Red Lodge, Montana (Red Lodge), violated state and federal law by using excessive force in unlawfully arresting and imprisoning him. Claiming that Defendants are liable under 42 U.S.C. § 1983 and state law, Groves seeks compensatory and punitive damages.  *Cmplt.* (*Court Doc. 5*).

-1-

The following motions are pending:

1.   Red Lodge's motion to exclude Groves' expert, Ron Tussing, from testifying on specific issues (*Court Doc. 28*);

2.   Red Lodge's motion for partial summary judgment (*Court Doc. 31*);

3.   Croft's and Neibauer's motion for summary judgment (*Court Doc. 36*); and

4.   Groves' motion to exclude Defendants' expert, Kevin Sailor, from testifying on specific issues (*Court Doc. 42*).

Having considered the parties' arguments and submissions, the

Court issues the following findings, recommendations, and order.[1]

## II.   BACKGROUND

For clarity, the Court divides the events giving rise to this action

in chronological segments.  Except where noted, the parties do not

dispute most material events.

### A.   Events Leading to Police Involvement

In the late afternoon or early evening on April 27, 2007, Groves,

his wife, and some friends went to the Snag Bar in Red Lodge to have

---

[1]By order dated September 30, 2010, Chief Judge Cebull referred this case to the undersigned for pretrial purposes pursuant to 28 U.S.C. § 636(b)(1), including submission of proposed findings and recommendations.  *Court Doc. 17.*

some drinks. *Defts Neibauer and Croft Statement of Undisputed Facts (Court Doc. 37) at ¶ 3 (citing Groves' Deposition (Court Doc. 37-1) at 200, ll. 14-25; 201, ll. 1-13).* Groves consumed six or seven shots of Patròn tequila and "at least" six or seven mixed drinks of Jack Daniels whiskey and Coke. *Court Doc. 37-1 at 201, ll. 13-16; 206, ll. 2-9.* He also used marijuana having "smok[ed] a little weed[,]" perhaps "two hits" that evening. *Id. at 203, ll. 4-10.*

At some point in the evening, Groves left the Snag Bar and went to the Snow Creek Saloon (saloon) with his friend, Steve Roat (Roat). *Id. at 203, ll. 17-25; 204, ll. 1-15; Deft Red Lodge's Stmt. of Uncontroverted Facts (Court Doc. 30) at ¶ 1 (citing Cmplt. at ¶¶ 3.2 - 3.3).* Groves walked into the saloon, said "hello" to the bartender, recognized a few patrons, and next remembers waking up with an officer standing over him. *Court Doc. 37-1 at 204, ll. 23-25; 205, ll. 1-7; 206, ll. 19-24.* Witnesses reported that Groves had been punched by a bar patron, fell to the ground, struck his head, and was knocked unconscious for at least two to three minutes. *Sched. Order (Court Doc. 19) at¶ 3(f) (Stipulations); Court Doc. 37-1 at 251, ll. 4-11.*

### B.   Involvement of Police Officers Neibauer and Croft

At about 11:00 p.m., on-duty Red Lodge police officers Neibauer and Croft were dispatched to the saloon because of a reported fight. *Court Doc. 19 at ¶ 3(d), (e), and (n).* When Neibauer and Croft arrived, witnesses told them that Groves was knocked unconscious when he was punched by a bar patron and fell to the ground, striking his head. *Id. at ¶ 3(f).* When Groves awoke, he was "groggy," "wondering what was going on[,]" and "in a daze." *Court Doc. 37-1 at 206, ll. 22-25; 209, ll. 9-11.* Neibauer helped Groves get up off of the floor and asked him if he was okay. Groves responded that he was fine and asked what had happened. *Id. at 206, ll. 21-26; 207, l. 1.*

At this point, the parties' characterizations of what occurred differ in certain respects. Neibauer claims that he pointed to his badge, told Groves he was a police officer there to help, grabbed Groves by the arm, and took him outside. *Stmt. of Neibauer (Court Doc. 47-1) at 1.* Neibauer maintains that he shined his flashlight on Groves' chest and saw that one of Groves' pupils was larger than the other, which Neibauer believed was a sign of a possible severe head injury. *Neibauer's Affidavit (Court Doc. 39) at ¶ 3; Court Doc. 47-1 at 1.*

Groves recalls that Neibauer "shin[ed] his flashlight in my eyes" and told Groves that he was taking him to the hospital.  *Id. at 207, ll. 2-6, 10-11.*  Groves contends that he told Neibauer that he was fine and did not want to go to the hospital.  *Court Doc. 37-1 at 207, ll. 8-19.*

Neibauer claims that Groves was "uncooperative, belligerent and aggressive" and "physically resistive to my efforts to transport him to the local hospital."  *Court Doc. 39 at ¶¶ 3, 4.*  Neibauer maintains that he asked Groves if he wanted to sit down, that Groves responded "F*** you" and "jerked his arm away from me[.]"  *Court Doc. 47-1.*

Groves maintains that when Neibauer told him to sit down, Groves responded "No, I'm fine.  What just happened?" and Neibauer told him he wanted to take Groves to the hospital, and Groves said "no."  *Court Doc. 37-1 at 207, ll. 7-11.*

At about this point, the parties agree that Neibauer grabbed Groves in a wrist hold and walked him back to Neibauer's patrol car where Neibauer had to hold Groves against the patrol car.  *Am. Answer of Croft & Neibauer (Court Doc. 22) at 4; Court Doc. 37-1 at 207, ll. 12-14; 251, ll. 21-25; 252, l. 1; Court Doc. 47-1 at 1.*  Neibauer opened his

patrol car door to put Groves in, but Groves shut the door and refused to cooperate in going to the hospital.  *Court Doc. 5 at ¶ 3.10; Court Doc. 22  at 4.*  Groves then got into the patrol car and Neibauer and Croft drove him to the hospital.  *Court Doc. 5 at ¶ 3.11; Court Doc. 19 at ¶ 3(g); Court Doc. 47-1 at 1; Court Doc. 47-2 at 1.*

Groves claims in his Complaint that, just before being transported to the hospital, he was "arrested and placed in handcuffs[ ]" and was advised that he was being "transported to the hospital for forced medical treatment, and was then forced into the patrol car, in handcuffs, by Officer Neibauer."  *Court Doc. 5 at ¶ 3.11.*  He also states in his affidavit filed in response to the police officers' summary judgment motion that at this point "Officer Neibauer then put handcuffs on me and put me into the patrol car.  I complied with the officer's demands at that time as I felt that I was under arrest." *Affidavit of Jeremiah Groves (Court Doc. 47-4) at ¶ 11.*  The officers statements do not indicate that Groves was put in handcuffs at that time.  The parties agree, however, that Neibauer never told Groves that he was under arrest when he was initially transported to the hospital for evaluation and treatment.  *Court Doc. 37-1 at 252, ll. 17-20; Court*

*Doc. 39 at ¶ 5; Court Doc. 40 at ¶ 5.*

Groves testified in his deposition that he does not remember the ride to the hospital or anything he said or did on the way. *Court Doc. 37-1 at 214, ll. 11-24.*

### C.   Events at the Hospital

Groves has described his time at the hospital as a "blur." *Court Doc. 37-1 at 214, l. 10.* Groves recalls a doctor telling him he was being vulgar and he remembers apologizing to the nurses present. *Id. at 215, ll. 11-16.* He admits that he has a "filthy mouth" and "like[s] to use the F word a lot." *Id. at 249, ll. 4-19.*

While at the hospital, dispatch informed Neibauer and Croft that Groves had an outstanding arrest warrant. *Court Doc. 19 at ¶ 3(h).* Groves concedes that there was an outstanding arrest warrant for him at the time. *Court Doc. 37-1 at 252, ll. 8-12.* Once Groves was medically "cleared," Neibauer and Croft arrested him on the outstanding warrant. *Court Doc. 39 at ¶ 6; Court Doc. 40 at ¶ 6.*

### D.   Transport from the Hospital to the Sheriff's Office

Neibauer and Croft then transported Groves from the hospital to

the Carbon County Sheriff's Office for processing and preparation for transport to the Yellowstone County Detention Facility in Billings, Montana. *Court Doc. 19 at ¶ 3(j).* Groves has no recollection of being transported from the hospital to the sheriff's office. *Court Doc. 37-1 at 252, ll. 13-16.*

Neibauer and Croft state in their affidavits that, after they informed Groves that he was under arrest, he "again became belligerent, aggressive, and uncooperative, to the point that he was verbally threatened with the use of a taser if he failed to comply with the [officers'] directions ...." *Court Doc. 39 at ¶6; Court Doc. 40 at ¶ 6.* The officers also state that Groves struggled with them and "was physically resistive to our attempts to handcuff him ....  When he was finally restrained and placed in the back seat of the patrol vehicle, he continued to be belligerent and attempted to kick out a back window in the patrol car.  He banged his head on the protective cage.  He asked [Neibauer] to shoot him.  He seemed mentally unstable." *Court Doc. 39 at ¶ 7; Court Doc. 40 at ¶ 7.*

**E.**   **Events at and outside of the Sheriff's Office**

At the sheriff's office, the officers placed Groves in handcuffs and

-8-

a belly chain, although Groves does not remember the officers putting a belly chain on him. *Court Doc. 37-1 at 218, ll. 10-20; Court Doc. 39 at ¶ 8; Court Doc. 40 at ¶ 8.* Although Groves states that he was "so drunk that I didn't know what was going on," he acknowledges that he knew he was in the officers' custody, under arrest, and that it would be unlawful and an escape for him to walk or run away from them. *Court Doc. 37-1 at 256, ll. 17-25; 257, ll. 1-7; 258, ll. 4-13.*

The officers maintain that Groves continued to be "uncooperative, aggressive, and belligerent." *Court Doc. 39 at ¶ 8; Court Doc. 40 at ¶ 8.* Groves, who admits to being "really angry," banged his head on a door. *Court Doc. 37-1 at 190, ll. 19-21; Court Doc. 39 at ¶ 8; Court Doc. 40 at ¶ 8.* The officers again verbally threatened Groves with the use of a taser if he continued to fail to comply with their directions. *Court Doc. 39 at ¶ 8; Court Doc. 40 at ¶ 8.*

After completing the necessary paperwork, Neibauer and Croft took Groves outside of the sheriff's office to their patrol car to transport him to Billings for detention. *Court Doc. 19 at ¶ 3(k).* As the officers attempted to place Groves in the vehicle, he became uncooperative and

refused to move.  When the officers each were "momentarily distracted" while placing their paperwork in the front seat of their patrol car, Groves "turned and began to run down a nearby alley [ ]" at a "dead sprint[.]" .  *Court Doc. 39 at ¶¶  9, 10 and 11; Court Doc. 40 at ¶¶  9, 10.*

Groves thinks that he "turned and walked away" or just "meander[ed] off."  *Court Doc. 37-1 at 191, ll 10-15; 192, ll. 3-9.*  But he testified at his deposition that he has no recollection of anything that happened from the time he and the officers left the back door of the sheriff's office until he found himself at St. Vincent's Hospital in Billings.  *Id. at 252, ll. 17-21.*  According to Neibauer and Croft, when Groves took off running, Croft yelled at Groves to stop and began a foot pursuit.  Groves had a "substantial lead" on Croft, and was "far ahead" of Neibauer.  Croft closed the distance to Groves and, when he was within the effective range of his taser – approximately 15 feet – he deployed the taser at Groves' back.  The taser probes struck Groves in his lower back and lower left leg.  *Court Doc. 39 at ¶ 11; Court Doc. 40 at ¶ 10.*  Groves fell forward.  When the officers rolled him over, Groves was unresponsive initially and had some blood coming from his nose

-10-

and some scrapes on his face and knuckles.  He regained consciousness before emergency medical personnel arrived.  *Court Doc. 39 at ¶ 12; Court Doc. 40 at ¶ 11.*

Groves was transported by ambulance back to the Beartooth Hospital.  He continued to be uncooperative at the hospital and hospital staff requested that the officers remain near the emergency room where Groves was being treated.  After a medical examination, Groves was transported to Billings for further medical evaluation and testing.  The officers released him from their custody at that point.  *Court Doc. 39 at ¶ 12; Court Doc. 40 at ¶ 11.*

### F.   **Disposition of Criminal Charges**

As a result of the events described above, Groves pled guilty to criminal charges of escape, disorderly conduct, resisting arrest, and unlawful possession of drug paraphernalia.  *Court Doc. 37-1 at 253, ll. 6-10; 255, ll. 14-24.*

### G.   **Groves' Claims**

In his Complaint, Groves makes the following claims:

 Count I:  Neibauer and Croft are liable under 42 U.S.C. § 1983 for violation of his rights under the Fourth and Fourteenth Amendments to the U.S. Constitution to be free from excessive

-11-

force and unreasonable search and seizure of his person, *Court Doc. 5 at ¶¶ 3.30.1, 3.31.3, and 4.2 - 4.5*;

Count II:  Neibauer and Croft are liable for assault and battery under Montana law, *id. at ¶¶ 5.2 - 5.4*;

Count III:  Neibauer and Croft are liable for false arrest and imprisonment under Montana law, *id. at ¶¶ 6.2 - 6.4*;

Count IV:  Red Lodge is liable under 42 U.S.C. § 1983 for developing and maintaining policies or customs that exhibit deliberate indifference to the constitutional rights of persons in Red Lodge, including inadequate and improper investigations of citizen complaints of police misconduct and inadequate supervision and training of police officers, *id. at ¶¶ 7.2 - 7.7*;

Count V:  Red Lodge is liable under Montana law for negligent hiring and supervision of its police officers, *id. at ¶¶ 8.2 - 8.3*; and

Count VI:  Red Lodge is vicariously liable under Montana law for the tortious acts of its police officers, *id. at ¶¶ 9.2 - 9.3*.

Groves seeks compensatory and punitive damages on all claims.

*Id. at ¶¶ 4.5, 5.4, 6.4, 7.7, 8.3, and 9.3.*

## III.  **DISCUSSION**

### A.  **Red Lodge's Motion to Exclude Groves' Expert, Ron Tussing, from Testifying on Specific Issues**

The Court first addresses the parties' motions seeking to exclude expert testimony.  Red Lodge moves to exclude testimony from Groves' expert, Ron Tussing (Tussing), with respect to Groves' claims under

both 42 U.S.C. § 1983 and Montana law for negligent hiring and supervision, failure to train and supervise, and illegal policies and customs. *Mtn. to Exclude (Court Doc. 28) at 1-2.* Red Lodge argues that "Tussing either has not disclosed opinions related to these issues, or his disclosures are substantially lacking in any foundation, either in law or fact, are speculative and conclusory, and are not based upon actual facts or data." *Red Lodge's Br. in Support of Mtn. to Exclude Expert Opinions (Court Doc. 29) at 2.*

Red Lodge filed its motion on August 1, 2011. *Court Doc. 28 at 1.* On August 17, the Court granted Groves' unopposed motion for additional time to respond to Red Lodge's motion. Groves nonetheless failed to respond and the time for doing so has passed. When a party opposing a motion fails to respond, as here, the Court has the discretion to deem the failure "an admission that the motion is well-taken." *Local Rule (L.R.) 7.1(d)(1)(B).*

Here, the Court has reviewed Tussing's report and Red Lodge's arguments seeking exclusion of Tussing's testimony with respect to specific issues. Red Lodge is correct that the only mention of the City of Red Lodge in Tussing's report is his conclusory statement that

"either the Red Lodge Police Department's policies are inadequate or the officers acted inappropriately, unethically and possibly illegally on their own volition." *Court Doc. 30-1 at* 4. Tussing does not mention his review of any City of Red Lodge policies or his review of any hiring or training materials. The Court thus agrees that Tussing's opinions on the issues identified by Red Lodge are speculative and conclusory, and do not appear to be based on actual facts or data. These conclusions, and Groves' complete failure to respond to Red Lodge's motion, compel the Court to grant this motion. As Groves notes in connection with his own motion to exclude experts, the proponent bears the burden of establishing the admissibility of proposed expert opinion testimony pursuant to Rule 702. *See Court Doc. 49 at 5 (citing Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 592, n. 10 (1993)).*

For these reasons, the Court will grant Red Lodge's motion and order that Tussing be precluded from testifying at trial on all topics related to the following claims or allegations: (1) that Red Lodge improperly hired Neibauer and Croft; (2) that Red Lodge failed to properly supervise and train Neibauer and Croft (whether under a 42 U.S.C. § 1983 or negligence standard); (3) that Red Lodge had improper

-14-

policies and procedures; and (4) that Red Lodge had illegal customs or practices that resulted in injury to Groves.

## B.   Groves' Motion to Exclude Defendants' Experts

Groves' motion to exclude Defendants' experts has two parts. First, Groves seeks to exclude Defendants' expert witness, Kevin Sailor (Sailor), from testifying with respect to points one through five of his expert report.  *Groves' Mtn. to Exclude (Court Doc. 42) at 1-2.*  Groves argues that Sailor's opinions "are purely speculative and conclusory in nature and are not based on any actual data, or verifiable information" and "are fundamentally flawed as those opinions lack any legal foundation."  *Br. in Support of Groves' Mtn. to Exclude (Court Doc. 43) at 1-2.*  More specifically, Groves argues that Sailor's opinions are based on his personal opinion and not on science.  Thus, he argues, Sailor's opinions are "not the product of reliable principles and methods" but rather are "only based on the facts as he understands them" without any analysis for how he reached his conclusions.  *Id. at 6-9.*

Second, Groves seeks to exclude Neibauer and Croft as expert witnesses.  *Court Doc. 42 at 2.*  He argues that Defendants failed to

include Neibauer and Croft reports that comply with Rule 26(a)(2)(B).[2] *Court Doc. 43 at 9-11.*

For the reasons that follow, the Court will deny both parts of Groves' motion. Addressing Groves' second argument first, the Court concludes that Defendants were not required to file written reports for Neibauer and Croft under Rule 26(a)(2)(B). Neither Neibauer nor Croft was "retained or specially employed to provide expert testimony in the case" and there has been no showing that either one's "duties as the party's employee regularly involve[s] giving expert testimony." *See Rule 26(a)(2)(B).* Rather, they are non-retained party witnesses who, as police officers, have specialized education, training, and experience that could aid lay jurors' understanding of arrest, use of force, and use of tasers. As such, they were required only to comply with Rule 26(a)(2)(C)'s disclosure requirements. The Court concludes that they did and Groves has neither argued nor shown that they did not. *See Expert Witness Disclosure of Defendants (Court Doc. 45-1) at 2-5.* Accordingly, the Court will deny Groves' motion to the extent it seeks

---

[2]References to rules are to Federal Rules of Civil Procedure unless otherwise indicated.

to exclude the expert testimony of Neibauer and Croft.

Next, the Court considers Groves' motion to exclude the opinions of Defendants' expert, Kevin R. Sailor.  Trial courts are vested with broad discretion in ruling on the admissibility of expert testimony under Rule 702 of the Federal Rules of Evidence.  *General Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997); *Samuels v. Holland American Line–USA Inc.*, ___ F.3d ___, 2011 WL 3863302, at *4 (9th Cir. 2011) (citing *U.S. v. W.R. Grace*, 504 F.3d 745, 759 (9th Cir. 2007)).  A qualified expert may testify concerning "scientific, technical, or other specialized knowledge" if such testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  "[R]ejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 Advisory Committee Notes (2000).

The trial court's "gatekeeping" role imposed by *Daubert v. Merrell Dow Pharmaceuticals*, "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is ... valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  509 U.S. 579, 592-93 (1993).  This process ensures expert testimony's reliability and relevancy, and makes certain that an

-17-

expert, "whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *BNSF Ry. Co. v. Quad City Testing Laboratory, Inc.*, 2010 WL 4534406, at *1 (D. Mont. 2010) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)). "Where an expert satisfies the Rule 702 standards, cross-examination is the proper method of challenging the expert's opinions." *Id.* (citing *U.S. Fidelity and Guar. Co. v. Soco West, Inc.*, 2006 WL 5230019 (D. Mont.2006)).

In the case at hand, Sailor included in his expert report his curriculum vitae. *Court Doc. 43-1 at 13-15.* It contains a listing of his qualifications to offer expert opinions in the areas identified in the report, including: (1) a brief section describing his formal education; (2) a recitation of his employment history, which involves multiple law enforcement positions spanning the past 37 years; (3) a list of certifications that he holds, including as an instructor in firearms and other less lethal weapons, including tasers; and (4) his qualifications and training specific to tasers, including his selection as a Senior Master Instructor by the Training Advisory Board of TASER

-18-

International.  *Id.*  This document shows that Sailor is "qualified as an expert by knowledge, skill, experience, training or education."  Fed. R. Evid. 702; *U.S. Fidelity and Guar. Co. v. Soco West, Inc.*, 2006 WL 5230019, at *1.

Also, Sailor's report, in compliance with Rule 26(a)(2)(B), includes a description of all facts and data he received and considered in formulating his opinions.  *Court Doc. 43-1 at 2-3.*  He affirmatively represents in his report that he offers all of his opinions "to a reasonable degree of certainty, based on [his] education, training and experience as a law enforcement officer and as a Senior Master Instructor for TASER International."  *Id. at 2.*  Sailor's report includes a detailed description of the facts upon which he relied in formulating his opinions.  *Id. at 3-6.*  Finally, Sailor's report includes his precise opinions and his bases for each opinion.

By way of example, in opining that Neibauer and Croft detained Groves to ensure his health and safety, Sailor notes undisputed evidence that: (1) Groves was "highly intoxicated"; (2) that bystanders at the saloon were concerned about Groves' physical status because he had been knocked unconscious for a period of time; and (3) that

Neibauer observed Groves' behavior – belligerent and aggressive – as suggesting that Groves was incapable of making rational decisions for himself. *Id. at 7.* Also, Sailor stated that it was "standard and accepted police practice" for Neibauer and Croft to perform a routine warrant check on Groves as he was being examined at the hospital. *Id.*

Sailor's other opinions similarly expressly rely on facts in the case, his 37 years of experience in law enforcement, and his specialized training in use of tasers in law enforcement. *Id. at 8-10.* For example, in formulating his opinion that Groves attempted to escape from custody when he walked or ran away from the officers, Sailor states that he relied on Groves' own knowledge and understanding that he had been placed in handcuffs secured with a belly chain, that he had been placed under arrest, and that he was not free to leave the officers, whether by walking or running away. *Id. at 7-8.* And Sailor rendered his opinion that the officers' use of a taser on Groves was reasonable and "complied with ... generally recognized and accepted police practices and procedures [ ]" based on all of the attendant circumstances – including Groves' intoxication, belligerent demeanor, and escape attempt – particularly in light of the safety risk to the

officers and others in the area.  *Id. at 8-9.*

Based on the foregoing, the Court concludes that Groves' motion

to exclude Sailor's expert opinions must be denied.  In reaching this

conclusion, the Court is unpersuaded by Groves' argument that Sailor

failed to offer "scientific methodology" to support his opinions.  Such

support is not required for every type of expert opinion.  *Kumho Tire*

*Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999) (noting that "no one

denies that an expert might draw a conclusion from a set of

observations based on extensive and specialized experience.").  The

Ninth Circuit has held that "in considering the admissibility of

testimony based on some other specialized knowledge [other than

scientific knowledge], Rule 702 generally is construed liberally."

*United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir.), *cert. denied*, 530

U.S. 1268 (2000) (internal citation omitted).

Here, as already discussed, Sailor's extensive experience and

training in law enforcement and, in particular in the use of tasers,

properly supports his formulation of the opinions he has rendered in

this matter.  The "scientific methodology" Groves urges as necessary is

inapplicable here in light of the subject matter and the types of

opinions rendered in this case.  As noted above, cross examination is the proper method of attacking Sailor's opinions.  *U.S. Fidelity and Guar. Co. v. Soco West, Inc.*, 2006 WL 5230019, at *2.

### C.   Red Lodge's Motion for Partial Summary Judgment

#### 1.   Summary Judgment Standards

The following standards apply to both pending summary judgment motions:

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A] party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Material facts are those which may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a

reasonable fact-finder to return a verdict for the nonmoving party.   *Id*.

Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.  "A moving party without the ultimate burden of persuasion at trial – usually, but not always, a defendant – has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Id*.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may

not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586, n.11.  Again, the opposing party must demonstrate that the fact in contention is material, *i.e.*, a fact that might affect the outcome of the suit under the governing law, *Anderson*, 477 U.S. at 248; *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F .2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, *i.e.*, the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Anderson*, 477 U.S. at 248 ("summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to

see whether there is a genuine need for trial." *Matsushita*, 475 U.S. at 587 (quotation omitted).

In resolving a summary judgment motion, the Court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed, *Anderson*, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the Court must be drawn in favor of the opposing party, *Matsushita*, 475 U.S. at 587 (citation omitted).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

### 2.   The Parties' Arguments

Red Lodge seeks summary judgment on Groves' Counts IV and V. In Count IV, Groves contends that Red Lodge is liable under 42 U.S.C. § 1983 for developing and maintaining policies or customs exhibiting

deliberate indifference to the constitutional rights of persons in Red Lodge, including inadequate and improper investigations of citizen complaints of police misconduct and inadequate supervision and training of police officers.  In Count V, Groves charges Red Lodge with negligent hiring and supervision under Montana law.  *Red Lodge's Mtn. for Partial Summary Judgment (Court Doc. 31) at 1-2; Red Lodge's Br. (Court Doc. 32) at 2.*[3]

First, Red Lodge argues that Groves' claims against it fail for lack of evidence because: (1) Groves, as a lay person, is not qualified to testify with respect to Red Lodge's hiring, supervision, policies, or customs, *Court Doc. 32 at 4-5*; and (2) Groves' expert's opinions, if any, on hiring, training, supervision, policies, and customs are subject to exclusion and thus cannot be used to overcome judgment in Red Lodge's favor, *id. at 5-6*.

Second, Red Lodge argues that Groves' § 1983 custom and practice claims against it are subject to summary judgment because: (1)

_____

[3]Red Lodge does not move for summary judgment on Count VI, Groves' remaining claim against it which alleges vicarious liability "for the torts of the Officers committed in the course and scope of their employment."  *Court Doc. 32 at 3-4.*

he has offered "no evidence that the alleged excessive use of force, or
the Officers' decisions preceding it, would have been a plainly obvious
consequence of [Red Lodge's] decision to hire and train [Neibauer and
Croft,]" *id. at 7-13*; (2) Groves "has failed to present evidence that [Red
Lodge] had any longstanding customs or practices of refusing to
supervise, train, or reprimand officers for alleged excessive use of force
... [or] for misconduct[,]" *id. at 13-14*; (3) Groves can present no
evidence of a single decision by a municipal policymaker that ratified or
approved a municipal employee's conduct that could form the basis of
municipal liability, *id. at 15*; (4) Groves has no evidence "of any
insufficient supervision or investigation into alleged excessive use of
force by Red Lodge Police Officers ... [or] of any investigation conducted
by [Red Lodge] which he contends was inadequate ... [or] that [Red
Lodge] conducts inadequate investigations 'of sufficient duration,
frequency and consistency that the conduct has become a traditional
method of carrying out policy[,]'" *id. at 15-16* (citation omitted); (5)
Groves has no evidence that Red Lodge failed to adequately train
Neibauer and Croft, *id. at 16-17*; and (6) "Groves cannot identify facts
which support the requisite causal connection between [Red Lodge's]

officers' alleged lack of training and their use of excessive force[,]" *id. at 17-18*.

Third, Red Lodge argues that Groves' state law claims against it for negligent hiring and training also are subject to summary judgment.  It argues that Groves can produce no evidence to establish: (1) negligent hiring or retention of the officers; (2) causation of his alleged injuries; or (3) the "requisite duty (standard of care)" for such claims.  *Id. at 19-21*.

In response, Groves focuses his entire argument on his position that municipal liability was triggered when a "municipal policy maker ratified the actions taken by Red Lodge officers."  *Groves' Resp. Br. (Court Doc. 41) at 4*.  He argues that two instances of such ratification occurred that preclude summary judgment against his claims against Red Lodge.

The first instance, Groves argues, was of an alleged conversation between Groves' father, Marty Micola, and Red Lodge Chief of Police Pringle.  *Id. at 4-7*.  Groves contends that Chief Pringle, in the conversation with Mr. Micola, offered to pay the medical costs for Groves' injuries that resulted from the incidents giving rise to this

action.  Groves maintains that the offer "amount[s] to a tacit admission that the Chief's officers acted improperly."  *Id. at 5*.  Groves also argues that Red Lodge and the officers have produced nothing in discovery indicating that the Red Lodge Police Department conducted any internal review of the events involving Groves or took any action in response to them, thus indicating ratification of the officers' actions. *Id. at 6*.  Groves argues that these circumstances "amount[ ] to a material issue of fact concerning the failure of [Red Lodge] to supervise and reprimand ... its officers."  *Id. at 7*.

The second instance upon which Groves relies is an "encounter that ... Neibauer had with an individual named Norbert Lelowicz." *Id*. Groves argues that, while Neibauer was investigating Mr. Lelowicz for suspicion of driving under the influence, Neibauer opened a pocket knife "in a threatening gesture towards Mr. Lelowicz[ ]" indicating that he was going to use the knife "to do a blood draw to establish Mr. Lelowicz's blood alcohol level[.]" *Id*.  Groves argues that Neibauer's actions were recorded on a video recording system and Groves has advised Defendants in discovery that he possesses the video recording. *Id. at 7-8*.  Groves also claims that in response to his discovery

-29-

requests, Neibauer provided a copy of Chief Pringle's review of the Lelowicz incident in which Chief Pringle "dispenses corrective action to Officer Neibauer for his assaultive behavior on Mr. Lelowicz." *Id. at 8.* Groves argues the these incidents "illustrate that the chief policymaker for the Red Lodge Police Department did in fact approve and ratify the conduct of Officer Neibauer." *Id. at 9.*

Red Lodge replies that Groves' response "fails both procedurally and substantively to overcome" its summary judgment motion. *Red Lodge's Reply Br. (Court Doc. 44) at 1-2.* Red Lodge argues that Groves' response is procedurally faulty because: (1) Groves' failed to file a statement of genuine issues as required by this Court's Local Rules, *id. at 6-7*; (2) he failed to support his alleged disputed facts with evidence in the record, *id. at 7-8*; (3) Groves' narrative descriptions of the "two instances" of ratification are inadmissible, *id. at 8-9*; (4) Groves failed to respond to Red Lodge's arguments seeking summary judgment in its favor on claims of improper hiring, training, or supervision of Neibauer and Croft or claims of an illegal or improper policy or procedure that caused the incident in question, thus subjecting the claims to summary judgment, *id. at 10*; and (5) Groves failed to respond to Red Lodge's

arguments seeking summary judgment in its favor on his claims under Montana law for negligent hiring and supervision, thus subjecting the claims to summary judgment, *id. at 10-11*.

Finally, Red Lodge argues that Groves' response is substantively faulty. Red Lodge argues that, even if the Court considers the alleged instances of ratification, they are insufficient to overcome summary judgment in light of recent and relevant legal authority from this Court. *Id. at 11-19*.

### 3.   <u>Analysis</u>

As an initial matter, the Court notes two significant defects in Groves' response to Red Lodge's summary judgment motion. First, Groves did not file a statement of genuine issues as required by Local Rule 56.1(b), which provides:

> Any party opposing a motion for summary judgment must also file a Statement of Genuine Issues. The Statement must:
>
> (1)   set forth in serial form each fact on which the party relies to oppose the motion;
>
> (2)   cite a specific pleading, deposition, answer to interrogatory, admission or affidavit before the Court to support each fact; and

(3)     be filed separately from the motion and
        brief.

*L.R. 56.1(b)(1) - (3).*

This rule serves important goals.  The statement of genuine

issues, with evidentiary citations, permits the moving party and the

Court to efficiently and expeditiously discern whether the party

opposing summary judgment has evidence showing a material fact

issue sufficient to allow a claim to proceed to trial.  The statement,

ideally, directs the movant and the Court to specific evidence in the

record – that is, "a specific pleading, deposition, answer to

interrogatory, admission or affidavit before the Court" that supports

each material fact that the responding party claims is in dispute.

Without the statement of genuine issues, the party seeking

summary judgment and the Court are left to search the record for

evidence that could demonstrate a genuine issue of material fact for

trial.  It is not this Court's task, however, "to scour the record in search

of a genuine issue of triable fact." *Pom Wonderful LLC v. Ocean Spray*

*Cranberries, Inc.*, 2011 WL 4852472, *1 (C.D. Cal. 2011) (quoting

*Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996)).  Instead, "counsel

have an obligation to lay out their support clearly." *Id. (*quoting

*Carmen v. San Francisco Sch. Dist.,* 237 F.2d 1026, 1031 (9th Cir.

2001).  The Court "rel[ies] on the nonmoving party to identify with

reasonable particularity the evidence that precludes summary

judgment." *Id.*  (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247,

251 (7th Cir. 1995) and citing *Guarino v. Brookfield Township Trustees*,

980 F.2d 399, 405 (6th Cir. 1992) ("[The nonmoving party's] burden to

respond is really an opportunity to assist the court in understanding

the facts.  But if the nonmoving party fails to discharge that burden –

for example, by remaining silent – its opportunity is waived and its

case wagered.")).

    Here, Groves not only failed to file a statement of genuine issues,

with evidentiary citations, but also failed otherwise to file or point to

evidence before the Court demonstrating the existence of a genuine

issue of material fact for trial.  This failure is fatal to those claims for

which Red Lodge now seeks summary judgment.

    The second defect in Groves' response is that he failed to respond

to Red Lodge's arguments seeking summary judgment in its favor on

some of his claims against it.  Specifically, Groves did not respond to

Red Lodge's arguments concerning: (1) his claims of improper hiring, training, or supervision of Neibauer and Croft; (2) his claims that Red Lodge had illegal or improper policies or procedures that caused the incidents giving rise to this action; or (3) his claims for negligent hiring and supervision under Montana law.

Rather, as noted, Groves' only response to the motion is that Red Lodge ratified the officers' actions at issue, relying on the two instances discussed above. But Groves failed to support this response with admissible evidence. Instead, Groves' counsel provides in his brief only an unauthenticated, hearsay, and therefore inadmissible, narrative description of these alleged instances. While he mentions alleged evidence supporting his arguments, he failed to submit it in response to Red Lodge's motion, and such evidence is not otherwise before the Court as part of the record. Thus, it cannot be considered in addressing the instant motion. *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 385 (9th Cir. 2010) ("A district court's ruling on a motion for summary judgment may only be based on admissible evidence.") (citations omitted).

After considering Red Lodge's motion and the parties' arguments

in light of the standards discussed above, the Court concludes that it is compelled to recommend that the motion be granted.  Groves has failed to identify, with evidentiary support in the record, any triable issue of material fact on his claims against Red Lodge at issue here.  The Court is left to conclude that he cannot prove the essential elements of his claims and thus there is no "genuine need for trial" of those claims. *Matsushita*, 475 U.S. at 587.

Also, as discussed in more detail below, even if the Court were to consider Groves' arguments in opposition to Red Lodge's motion as though accompanied by evidentiary support, the Court nevertheless concludes that it must recommend that summary judgment be granted in Red Lodge's favor.

Judge Lynch, in *Haflich v. McLeod*, 2010 WL 5665043, *2-3 (D. Mont. 2010) recently set forth the standard for municipal liability under 42 U.S.C. § 1983.  As Judge Lynch wrote, 42 U.S.C. § 1983 provides a cause of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  Municipal entities may be liable under § 1983, but not on a respondeat superior theory.  *Monell* [*v. Department of Social Services*],

436 U.S. 658, 690-94 (1978).  Rather, it is only when "the municipality itself causes the constitutional violation through 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy [ ]' " that the municipality is responsible under § 1983.  *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 984 (9th Cir. 2002) (quoting *Monell*, 436 U.S. at 694).  Thus, to hold a municipality liable under *Monell*, the plaintiff must prove three elements: (1) the existence of an official policy or custom that (2) caused the plaintiff to be subjected to (3) the denial of a constitutional right. *Conn v. City of Reno*, 591 F.3d 1081, 1102 (9th Cir. 2010) (citations omitted).  The courts must strictly adhere to the stringent requirements for imposing § 1983 liability under *Monell* so that liability is not imposed based on the doctrine of respondeat superior.  *See City of Canton v. Harris*, 489 U.S. 378, 392 (1989).

> Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.

*Board of County Commissioners of Bryan County v. Brown*, 520 U.S.

-36-

397, 405 (1997).

In the absence of an expressly adopted official policy, there are three ways to show a policy or custom of a municipality. But Groves' summary judgment response renders only one of the ways potentially applicable, and that is by showing that an official with final policy making authority either delegated that authority to, or ratified the decision of, a subordinate. *See Rosenbaum v. City and County of San Francisco*, 484 F.3d 1142, 1155 (9th Cir. 2007).

> Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy.

*Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (citation omitted).

A policy is "'a deliberate choice to follow a course of action made from various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question'." *Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002) (per curium) (citing *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992)) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)).

A policy or custom can be one of action or inaction. *Long v.*

*County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006) (citing *City of Canton*, 489 U.S. at 388). Acts of "omission" may provide the basis for municipal liability under § 1983 when the "omissions amount to the local government's own official policy." *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010) (citation omitted). To impose liability on a municipality for acts of omission, the omission must amount to "deliberate indifference to a constitutional right." *Id.* This standard is met when the need to act "is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* (quoting *City of Canton*, 489 U.S. at 390).

Municipal liability based on ratification requires a "showing that an official with final policymaking authority [ ... ] ratified a subordinate's unconstitutional decision or action and the basis for it." *Clouthier*, 591 F.3d at 1250 (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992)). Authorized policymakers' "ratification would be chargeable to the municipality because their decision is final." *Id.* (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). The

evidence must demonstrate, however, that a conscious, deliberate choice to ratify conduct is made from among various alternatives. *Id.*

To ultimately sustain a *Monell* claim, the plaintiff must show a sufficient causal connection between enforcement of the municipal policy or practice and the violation of the plaintiff's federally protected right by proving that enforcement of the policy or practice was the "moving force" behind the violation. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 166 (1993); *City of Canton*, 489 U.S. at 385 (recognizing there must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation").

These strict standards that apply to a ratification theory of liability under § 1983 foreclose Groves' claims against Red Lodge. This Court noted in *Haflich* that:

> A policymaker must cast a subordinate's conduct "in the form of a policy statement [that is] expressly approved by the supervising policymaker[.]" *Gillette*, 979 F.2d at 1348 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988)). Absent evidence that the policymaker "made a conscious, affirmative choice to approve [the officer's] actions and adopt them as official policy[,]" liability cannot be imposed on the municipality. *Clouthier*, 591 F.3d at 1253. The policymaker must deliberately choose to "endorse" the

-39-

> subordinate's conduct and the basis for it "before the
> policymaker will be deemed to have ratified the
> subordinate's discretionary decision." *Gillette*, 979 F.2d at
> 1348. A mere failure "to overrule the unconstitutional
> discretionary acts of subordinates[,]" without expressly
> endorsing or approving of the conduct, is an insufficient
> predicate for the imposition of liability against the
> municipality. *Id*.

*Haflich*, 2010 WL 5665043, *8.

Here, neither of the instances of ratification upon which Groves

relies constitutes ratification sufficient to impose liability on Red

Lodge.   First, even accepting as true – without the benefit of

admissible proof – Groves' position that Chief Pringle offered to pay the

medical costs for Groves' injuries, there is no evidence that Pringle or

any other alleged Red Lodge policy maker expressly approved,

endorsed, or ratified Neibauer's and Croft's conduct as Red Lodge's

official policy.

Second, Groves' other asserted instance of ratification also fails to

meet the above standard. The instance involved Neibauer opening a

pocket knife in what Groves has described as "a threatening gesture"

indicating that he was going to use the knife "to do a blood draw to

establish [a DUI suspect's] blood alcohol level." *Court Doc. 41 at 7*.

Groves states that he was provided in discovery a copy of Chief Pringle's review of the incident and acknowledges that Chief Pringle "dispense[d] corrective action to Officer Neibauer for his assaultive behavior on [the DUI suspect]." *Id. at 8.* Thus, it cannot reasonably be argued – and has not been shown with admissible evidence – that any Red Lodge policy maker expressly approved, endorsed, or ratified Neibauer's conduct as Red Lodge's official policy.

For all of the foregoing reasons, the Court will recommend that Red Lodge's motion for partial summary judgment be granted.

### D.   Summary Judgment Motion by Neibauer and Croft

#### 1.   The Parties' Arguments

Neibauer and Croft (the officers) seek summary judgment on all of Groves' claims against them.  First, they argue that Groves was not falsely arrested either before his transport to the hospital or after his release from the hospital.

With respect to Groves' claim that the officers falsely arrested him when they initially brought him to the hospital for examination and treatment, the officers argue that "they were statutorily bound to protect the welfare and health status of Groves when it was obvious he

was impaired by alcohol to the extent he was unable to make reasonable and rational decisions about his own health status." *Court Doc. 38 at 8* (citing *MCA § 53-24-303*).  They also argue that Montana law renders them immune from civil liability for assisting an intoxicated Groves to a healthcare facility.  *Id. at 9* (citing *MCA § 53-24-303(2)*).  Alternatively, the officers argue that both federal and state common law recognizes a duty of law enforcement officers to protect the public's welfare under the so-called "community caretaking function" and reasonably performing this duty shields them from tort liability stemming from the performance.  *Id. at 10-11*.

To the extent Groves claims that Neibauer and Croft falsely arrested him and imprisoned him after he was medically released from the hospital, the officers argue that the valid warrant for his arrest operates as a complete defense to that claim.  *Id. at 11-12*.  They argue that Montana law provides that "probable cause is a defense to both false arrest and false imprisonment."  *Id*.

Second, Neibauer and Croft argue that Groves has no viable claim for use of excessive force.  They argue that the force they used was objectively reasonable under the totality of the circumstances.  Also,

-42-

they argue that they were justified under both Montana and federal law to use a taser to prevent Groves' unlawful escape. *Id. at 12-14*. They further argue that Groves' state law claims for assault and battery also fail as a matter of law in light of the reasonableness of their use of force under the circumstances. *Id. at 14*.

Third, the officers argue that qualified immunity shields them from liability against Groves' Fourth Amendment claim based on both unlawful arrest and excessive use of force. They argue that their arrest of Groves, pursuant to a valid warrant based on probable cause, "satisfies the objective reasonableness component of the qualified immunity analysis" and renders them immune on that claim. *Id. at 14-16*. Also, they claim qualified immunity on Groves' excessive use of force claim. The officers argue that their use of force was based on a reasonable belief, under the circumstances, that the force used was lawful entitling them to qualified immunity. *Id. at 16*.

Finally, Neibauer and Croft argue that all of Groves' state claims against them should be dismissed based on statutory immunity. *Id. at 18-20* (citing *MCA § 2-9-305*).

Groves responds that genuine issues of material fact preclude

-43-

summary judgment in the officers' favor. *Groves' Resp. to Officers' Mtn. (Court Doc. 47) at 9.* First, Groves argues that the officers' reliance on their statutory duty to assist an intoxicated Groves is inapplicable since it was not his intoxication, but rather his being knocked unconscious, that prompted them to bring him to a hospital for medical treatment. Thus, he argues, they falsely arrested him and unlawfully seized him. *Id. at 9-11.* Groves also argues that the "community caretaker doctrine" is inapplicable here because the officers "did not have an objective[ly] reasonable basis to believe that Groves was seriously injured" and their "actions exceeded the scope of the caretaking functions." *Id. at 11-14.*

Second, Groves argues that the warrant for his arrest does not negate his false arrest and imprisonment claims. *Id. at 14.* He concedes that arrest by the officers after they discovered a valid arrest warrant for him was not improper. *Id.* But he maintains that they wrongfully arrested, detained, and seized him before they knew about the warrant while he was still at the saloon. *Id. at 14-15.*

Third, Groves argues that the officers used excessive force on him. He argues that Neibauer used excessive force when he "detained,

strong-armed, and handcuffed Groves before putting him into his patrol car outside the ... saloon." *Id. at 15*. And he argues that "Croft used excessive force when he used his taser on Groves knowing Groves had a concussion, was belly chained, handcuffed ..., intoxicated, and was already under arrest." *Id*. In both instances, Groves argues, any governmental interest did not justify the amount of force the officers used under the circumstances, and the officers' actions were not objectively reasonable. *Id. at 18-27*.

Fourth, Groves argues that the officers are not entitled to qualified immunity. *Id. at 27*. He maintains that, as already argued above, fact issues preclude summary judgment on whether the amount of force used was excessive under the circumstances. Moreover, he argues, Neibauer knew that his detention of Groves outside of the saloon violated Groves' Fourth Amendment right to be free from an unlawful seizure. *Id. at 27-28*. Also, Groves argues, "[a]lthough the law regarding the use of a taser was not clearly established as the Officers assert," the issue here is whether it was clearly established that a citizen has a right "to be free from excessive use of force under the facts and circumstances presented in this case." *Id. at 29-30*. Here,

Groves argues, because that right was clearly established at the time Croft tased him, the officers are not entitled to qualified immunity.  *Id. at 30-31.*

Finally, Groves argues that the officers are not entitled to state statutory immunity for Groves' claims against them based on federal law.  He notes that the Montana statute "may give immunity to the Officers for the state law claims," but he argues that federal law preempts state law that purports to immunize government conduct otherwise subject to liability under 42 U.S.C. § 1983.  *Id. at 31-32.*

In reply, Neibauer and Croft first argue that Groves has attempted to meet their motion for summary judgment with inadmissible evidence.  *Officers' Reply Br. (Court Doc. 50) at 1-3.*  They argue that evidence Groves filed in opposition to their motion, including his own affidavit and an affidavit from Steve Roat, contain statements "that are not based on personal knowledge and contain information that is factually inconsistent with [Groves'] deposition testimony."  *Id. at 1.*  This evidence, the officers argue, cannot be used to create genuine issues of material fact to defeat summary judgment.  *Id. at 1-3.*

Second, Neibauer and Croft argue, with respect to their position that they were obligated by statute and common law to protect Groves' health and safety, that it was not necessary for them to ask Groves whether he was intoxicated because it was readily apparent that he was. Also, they argue, Groves cannot now rely on Roat's affidavit to assert that he was actually "coherent and responsive ... not belligerent or obnoxious, ... [and] calm and relaxed" after being knocked unconscious while already in an extremely intoxicated state, especially when Groves already testified at his deposition that he was "wasted" and "agitated" because Neibauer wanted him to go to the hospital to get checked out. *Id. at 3-4.*

Neibauer and Croft also point to other inconsistencies between Roat's affidavit and Groves' sworn deposition testimony. *Id. at 5.* They argue that these "conflicts are insufficient to create any genuine issue of material fact regarding the officers' obligation to protect Groves from himself because of his significant, and observable, level of intoxication, combined with their knowledge that Groves had been knocked unconscious and struck his head when he fell to the floor." *Id. at 6.*

They note that the Montana Supreme Court in *State v.*

-47-

*Spaulding*, 259 P.3d 793 (Mont. 2011), recently applied the community caretaker doctrine in evaluating a deputy's conduct in stopping to check the welfare of vehicle occupants on a remote road in the middle of the night. While the court determined that the stop was a temporary seizure, it also concluded that the stop satisfied an exception to the warrant requirement because objective, specific, and articulable facts existed from which the deputy could suspect that the occupants needed help or were in peril. The officers argue that the same rationale applies here because they had objective and articulable facts justifying their concern for Groves' safety and potential need for medical treatment. *Court Doc. 50 at 6-8.* Thus, they argue, "[h]e has no claim for false arrest, either at the time he was taken to the hospital or when he was arrested at the hospital based on valid and outstanding arrest warrants." *Id. at 8.*

Third, Neibauer and Croft argue that their use of force to restrain and detain Groves, and later to prevent Groves from escaping, were reasonable under the totality of the circumstances. *Id. at 9-12.* They argue that: (1) Groves' affidavit statements about what occurred when he was taken from the sheriff's office to the awaiting patrol vehicle are

-48-

a "sham" because he previously testified that he had no recollection of what happened during that time, *id. at 9*; (2) Groves cannot make out a claim for excessive force when Neibauer placed Groves in a vehicle to take him to the hospital because Groves has offered no evidence that he suffered any physical injury from that occurrence, *id. at 10*; and (3) the reasonableness of using a taser against Groves must be viewed under the totality of the circumstances rather than with "the 20/20 vision of hindsight," asking only whether less force was more appropriate, or wondering whether feasible alternatives could have been used, *id. at 11-12*.

Finally, the officers argue that Groves' opposition to their claim of qualified immunity is flawed. They note that, under recent authority from this Court, qualified immunity applies when a taser is used provided that some degree of force was reasonable under the circumstances. *Id. at 13*.

## 2. <u>Analysis</u>

Groves' claims against the officers for assault and battery, false arrest and imprisonment, and excessive use of force, each arise with respect to two different periods of time. The first set of claims relates

to the officers initially encountering Groves at the saloon, placing him in a patrol vehicle, and transporting him to the hospital for medical treatment. The second set of claims relates to the officers arresting Groves at the hospital, transporting him to the sheriff's office, moving him out to a patrol vehicle for transport to Billings, and shooting him with a taser as he attempted to escape. Groves alleges claims arising under both state and federal law relating to each different period of time.

> ### a. Claims Related to Officers Encountering Groves at Saloon, Placing Him in Patrol Vehicle, and Transporting Him to Hospital

The officers argue that they are not liable for any of Groves' state law claims that he alleges arise from their conduct in taking him from the saloon to the hospital because he was intoxicated and injured and they were assisting him in compliance with Montana law. *Court Doc. 38 at 8-9; Court Doc. 50 at 3-6.* The Court agrees.

MCA § 53-24-303, titled "[t]reatment and services for intoxicated persons[,]" provides:

> (1)    A person who appears to be intoxicated in a public place and to be in need of help may be assisted to the person's home, an approved private treatment facility, or other health care

facility by the police.[4]

> (2)    A peace officer acting within the scope of the officer's
> authority under this chapter is not personally liable for the
> officer's actions.

An "intoxicated person" is defined as "a person whose mental or physical functioning is substantially impaired as a result of the use of alcohol." *MCA § 53-24-103(10)*. A person who appears to be intoxicated in public "may be detained by a peace officer for the person's own protection." *MCA § 53-24-107(1)*. But a peace officer who detains the person "shall proceed in the manner provided in [§] 53-24-303 [*supra*]" and "shall make every reasonable effort to protect the person's health and safety. The peace officer may take reasonable steps for the officer's own protection." *MCA § 53-24-107(3)*. Finally, "[a] peace officer, acting within the scope of the officer's authority under this chapter, is not personally liable for the officer's actions." *MCA § 53-24-107(4)*.

Here, it is undisputed that Groves was in a public place when

---

[4]In 2005, the Montana Legislature removed from this provision the requirement that the intoxicated person first consent to an offer of help before police assist them. *See 2005 Montana Laws Ch. 442*. Events at issue here occurred on April 27, 2007. *Court Doc. 19 at ¶ 3(e)*. Thus, the officers did not first need Groves' consent before assisting him.

events giving rise to this action occurred.  He was first in a public bar drinking alcohol and had moved to a different public bar when he was knocked unconscious after being punched.  *Court Doc. 37-1 at 200, ll. 15-18; 203, ll. 16-24.*  After the officers arrived, he walked or was led outside to a public sidewalk or street.  *Id. at 206, ll. 15-25; 207, ll. 1-13.*

Also, it is undisputed that Groves was highly intoxicated.  He admitted in his deposition that: (1) in the course of the evening,[5] he consumed "at least" 12 to 14 alcoholic drinks, *id. at 206, ll. 2-9;*[6] (2) when he arrived at the saloon, he "was pretty well lit[,]" *id. at 205, ll. 12-15;*[7] (3) he agreed that he was "wasted" that evening, at least partially because of being drunk, *id. at 248, ll. 4-11;* (4) as a bartender, he knows when someone is "really drunk," he was in "that really drunk

---

[5]The record reflects that Groves began drinking alcohol "maybe not early in the evening, but towards the evening," *Court Doc. 37-1 at 200, ll. 14-19*, and that the officers were dispatched to a fight at the saloon at about 11:00 p.m. *Court Doc. 19 at ¶ 3(e).*

[6]Groves explained at his deposition that drinks at the Snag Bar, where he had been drinking, are usually "pretty stiff, so they had to have been close to doubles, but not quite."  Court Doc. 37-1 at 206, ll. 10-14.

[7]He also admits to having smoked marijuana that evening.  *Court Doc. 37-1 at 203, ll. 4-10; 266, ll. 24-25; 267, l. 1.*

stage," and had he been tending bar he would have cut himself off from

alcohol long before he reached the state of drunkenness that he was in,

*id. at 248, ll. 12-18*; and (5) he knew that about two or three hours after

he was taken to the hospital in Billings that his blood alcohol content

was .280, which he agreed is "really high," *id. at 248, ll. 19-24.*

The officers also were concerned about Groves' health status and

ability to make competent decisions for himself in part because of his

"level of intoxication[.]" *Court Doc. 39 at ¶ 3; Court Doc. 40 at ¶ 3.*

Groves has offered no evidence to the contrary.  Also, a video recording

of the booking area in the sheriff's office with Groves present

approximately 45 minutes after he was knocked unconscious also shows

Groves' behavior to be consistent with someone who appears to be

intoxicated.  *See Affidavit of Beth Parks (Court Doc. 52) and Notice of

Filing Items (Court Doc. 53) at Ex. C.*

In light of the undisputed facts described above, the Court

concludes that Groves was intoxicated in public.  Also, because of

undisputed evidence that he had been knocked unconscious, it was

reasonable for the officers to conclude that he was in need of help.[8]
Thus, the officers, acting within their authority as "on duty" police
officers, *see Court Doc. 19 at ¶ 3(n)*, were permitted under Montana law
to detain Groves for his own protection and to transport him to an
appropriate health care facility for evaluation and treatment. *MCA §§
53-24-107 and -303.*  In having complied with the specific requirements
of the statutes, they cannot now be held personally liable for false
arrest and imprisonment, *MCA §§ 53-24-107(4) and -303(2),*
particularly since their temporary detention of Groves at that time was
to assist him and was neither an arrest nor an imprisonment.

These statutes apply with equal force in barring Groves' state law
claims of assault and battery.  *Id.*  As set forth above, an officer may
detain a person who appears to be intoxicated in public "for the person's
own protection."  *MCA § 53-24-107(1).*  The officer "shall make every
reasonable effort to protect the person's health and safety" but also is
permitted to "take reasonable steps for the officer's own protection."

---

[8]Groves does not dispute the officers' statements that witnesses
reported to them that Groves had been "punched hard, knocked to the
floor, striking his head, and was unconscious for at least two to three
minutes."  Court Doc. 39 at 2, ¶ 3; Court Doc. 40 at 2, ¶ 3.

*MCA § 53-24-107(3).*  There is no evidence that the officers, in assisting

a resistive, publicly intoxicated Groves, deviated from reasonable

efforts to protect Groves' health and safety or ensure their own

protection under the circumstances.  Thus, the officers are "not

personally liable for [their] actions."  *MCA § 53-24-107(4).*  Groves has

failed to point to a genuine issue of material fact that would preclude

summary judgment in the officers' favor on any of his state law claims

related to the time at issue.

Groves' principal argument in challenging the officers' reliance on

the foregoing statutes is his belief that the officers were assisting him

not because of his intoxication but because he had suffered a blow to

the head of such severity that he was rendered unconscious for a period

of time.  *Court Doc. 47 at 9-11.*   Thus, he argues, the statutes are

inapplicable.  *Id.*

The Court is not persuaded.  Groves has offered no evidence

sufficient to raise a genuine issue of material fact with respect to

whether he was intoxicated or whether the officers knew of his

intoxication at the time.  As noted, the record is replete with evidence,

including Groves' own testimony, that he was highly intoxicated.  There

is no evidence that he was not intoxicated.

Although Groves notes that neither officer mentioned his drunkenness in their reports or asked him how much he had been drinking, it was not necessary for them to do so to be in compliance with the statutes.  The statute's plain language provides that a police officer may assist a person who "appears" drunk.  *See MCA § 53-24-303(1).*  If someone appears drunk, it is not necessary, nor is it required under the statutes, that the officer either ask the person how much alcohol they have consumed or record that information in a police report.  And from the amount of alcohol Groves admits to consuming that evening, it would not be unreasonable for the officers to conclude that he was highly intoxicated when they encountered him.  Thus, Groves' argument fails.

For the foregoing reasons, the Court will recommend that the officers' summary judgment motion be granted to the extent it relates to Groves' state law claims against them related to the time at issue.[9]

---

[9]Because of this conclusion and those that follow, the Court does not reach the officers' argument that they enjoy immunity from liability under MCA § 2-9-305.

The officers next argue that they are not liable for any of Groves'
§ 1983 claims stemming from their conduct in restraining him to move
him from the saloon to the hospital.  Thus, the Court must determine
whether the amount of force Neibauer used in restraining Groves for
transport to the hospital was excessive and thus an unreasonable
seizure of his person in violation of the Fourth Amendment.  The Court
concludes that it was neither.

Although the Court already has concluded, *supra*, that the officers
did not arrest Groves when they detained him for transport to the
hospital, the Court analyzes Groves' § 1983 excessive force claim
related to that temporary detention under the standards governing
excessive force claims incident to an arrest.  A claim of excessive force
is analyzed under the Fourth Amendment's reasonableness test
balancing the "nature and quality of the intrusion on the individual's
Fourth Amendment interests against the countervailing government
interests at stake."  *Graham v. Connor*, 490 U.S. 386, 396 (1989)
(citation omitted); *Mattos v. Agarano*, ___ F.3d ___, 2011 WL 4908374,
at *5 (9th Cir., Oct. 17, 2011).  The reasonableness of the force used is
judged from the "perspective of a reasonable officer on the scene, rather

than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

In evaluating whether law enforcement officers used excessive and, thus, "unreasonable" force, courts begin by "considering the nature and quality of the alleged intrusion[.]" *Mattos*, 2011 WL 4908374, at *6. Then courts "consider the governmental interests at stake by looking at (1) how severe the crime at issue is, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Id*. (citing *Deorle v. Rutherford*, 272 F.3d 1272, 1279–80 (9th Cir. 2001)).  "These factors, however, are not exclusive.  Rather, [courts are to] examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Id*. (citing *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994))).  Thus, "in assessing the governmental interests at stake under *Graham*, [courts] are free to consider issues outside the three enumerated above when additional facts are necessary to account for the totality of circumstances in a given case." *Id*.  Of the three *Graham* factors, the Ninth Circuit has determined

that the "most important" is whether the suspect posed an "immediate threat to the safety of the officers or others." *Id.* (citations omitted).

When weighing an excessive force claim, summary judgment is appropriate if the court "concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994); *see also Graham*, 490 U.S. at 397. Courts are to remain mindful that "[a]ll determinations of unreasonable force must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Henrich*, 39 F.3d at 914 (quoting *Graham*, 490 U.S. at 396–97) (internal quotations omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, ... violates the Fourth Amendment." *Graham*, 490 U.S. 396 (citation and internal quotations omitted).

In assessing the nature and quality of the alleged intrusion – and in doing so, assessing the type and amount of force used – the Court notes that it is undisputed that Neibauer attempted several times, both

by asking Groves and by grabbing Groves' arm or wrist, to get Groves to go with him to get medical attention.  Groves repeatedly refused and pulled his arm away from Neibauer.  *Court Doc. 47 at 3-4*.  The parties agree that Neibauer ultimately put one of Groves' hands behind his back in an "escort hold" to take him to the patrol vehicle for transport to the hospital.  *Court Doc. 22 at 4; Court Doc. 37-1 at 207, ll. 12-14; 251, ll. 21-25; 252, l. 1; Court Doc. 47-1 at 1*.  Groves also claims that Neibauer pushed him against the side of the vehicle in an effort to control him.  *Court Doc. 47 at 5*.

There is no dispute that when Neibauer opened his vehicle door to put Groves in, Groves used his free hand to shut the door, refusing to cooperate in going to the hospital.  *Court Doc. 5 at ¶ 3.10; Court Doc. 22 at 4; Court Doc. 37-1 at 207, ll. 14-18*.  Groves claims that Neibauer then handcuffed him.  *Court Doc. 37-1 at 207, ll. 18-19*.  The parties agree that Groves then got into the patrol car and the officers drove him to the hospital for evaluation and treatment.  *Court Doc. 5 at ¶ 3.11; Court Doc. 19 at ¶ 3(g); Court Doc. 47-1 at 1; Court Doc. 47-2 at 1*.

In sum, the facts, construed in the light most favorable to Groves,

are that Neibauer:  asked Groves to let him take him to the hospital or told him he was going to take him; grabbed Groves' wrist or arm three or four times and Groves pulled away each time; put one of Groves' arms behind his back long enough to walk him to the patrol vehicle; pushed Groves against the vehicle to control him; and, placed handcuffs on Groves for the drive to the hospital.

The Court concludes that the use of the force described above was reasonable under the circumstances.  As noted, Groves was extremely intoxicated.  He had just regained consciousness after being punched and knocked to the ground.  Neibauer had observed that Groves' pupils were different sizes.  This observation, coupled with Neibauer's understanding that Groves had just been unconscious after a blow to the head, reasonably gave Neibauer concern that Groves may have suffered a serious head injury.  After unsuccessfully attempting to verbally persuade Groves to let Neibauer take him to get medical attention, Neibauer attempted to lead an admittedly "groggy" Groves (*Court Doc. 37-1 at 206, l. 24)*, who was "wondering what was going on" and who was "in a daze[,]" (*Id. at 209, ll. 9-11)* by the arm or wrist to a vehicle to be transported to the hospital.  Groves resisted repeatedly by

-61-

pulling away from Neibauer's grasp.  Ultimately, Neibauer put one of

Groves' hands behind his back in an "escort hold" to walk him to the

vehicle.  He held Groves against the vehicle to gain control as Groves

resisted, ultimately having to place handcuffs on Groves so that he

could transport him to the hospital.

The Ninth Circuit has held that even more intrusive and

aggressive police conduct than Neibauer's was objectively reasonable.

*See, e.g., Tatum v. City and County of San Francisco*, 441 F.3d 1090,

1095-97 (9th Cir. 2006) (holding use of "control hold" objectively

reasonable, even though suspect died a few minutes after its use, where

suspect posed a threat to himself and others for bizarre behavior,

including kicking police station door for no apparent reason).  The court

in *Tatum* also cited the following cases to demonstrate decisions in

which the Ninth Circuit has found similar police conduct objectively

reasonable: "*Johnson v. County of Los Angeles*, 340 F.3d 787, 793 (9th

Cir. 2003) (concluding that hard pulling and twisting to remove a

suspect from a crashed getaway car was objectively reasonable even

though Johnson asserted that the officer's conduct rendered him

paraplegic); *Jackson v. City of Bremerton*, 268 F.3d 646, 652–53 (9th Cir.

-62-

2001) (applying *Graham* and concluding that spraying woman's hair with a chemical irritant prior to her arrest, pushing her to the ground to handcuff her, and roughly pulling her to her feet during her arrest was not excessive force).  *Tatum*, 441 F.3d at 1097.

Based on the foregoing, the Court finds that the nature and quality of force that Neibauer's used was reasonable and justified under the circumstances.  This conclusion is amplified by Neibauer's repeated attempts to verbally persuade Groves to accompany him to get medical care and the relatively minor amount of force used for a short period of time to obtain Groves' compliance.

In analyzing the importance of the governmental interests at stake, the Court first notes that, at the time Neibauer encountered Groves, no crime by Groves was at issue.  Neibauer was attempting to render aid to a highly intoxicated, injured person.  With respect to whether any force should have been used, this factor weighs in Groves' favor.

Second, in light of Groves' admittedly high level of intoxication, head injury, and uncooperative behavior, it was reasonable for the officers to conclude that Groves posed an immediate threat of harm to

himself.  Thus, this factor, which the Ninth Circuit deems "most important," supports the amount of force Neibauer used.

Third, it is undisputed that Groves was actively resisting Neibauer's attempts to restrain him.  He declined Neibauer's verbal requests to accompany him to seek medical care.  He pulled away from Neibauer's grasp several times.  And he purposely shut a vehicle door Neibauer opened for him while attempting to transport him to the hospital.  This factor supports the amount of force that Neibauer used.

Viewing the totality of the circumstances in weighing the gravity of the intrusion against the government's interest, the Court concludes that Neibauer acted reasonably in employing the type and amount of force used in the situation he confronted.  The relatively minor amount of force Neibauer used under these circumstances was proportionate to Groves' responses to him, and thus was reasonable and appropriate.

Construing the facts in the light most favorable to Groves, the Court concludes that Neibauer did not violate Groves' right to be free from excessive force.  Thus, the Court will recommend that the officers' motion for summary judgment be granted with respect to this claim.

### b.   Claims Related to Officers Arresting Groves at the Hospital and Shooting Him With a Taser as He Fled

The officers argue that they are not liable for Groves' state law claims that he alleges arise from their conduct of arresting him at the hospital, transporting him to the sheriff's office, moving him from the sheriff's office to an awaiting patrol vehicle, and shooting him with a taser as he tried to escape. *Court Doc. 38 at 11-14.*  The Court agrees.

With respect to Groves' false arrest and imprisonment claim, Groves concedes that the existence of probable cause is a complete defense to claims of false arrest and false imprisonment.  *Court Doc. 47 at 14.*  Under Montana law, an arrest warrant may issue if "there is probable cause to believe that the person against whom the complaint was made has committed an offense[.]" *MCA § 46-6-201.*  Here, Groves has offered no evidence raising a genuine issue of material fact with respect to whether the warrant for his arrest was valid.  Because the existence of probable cause, upon which the valid arrest warrant was based, is a defense to false arrest and imprisonment, *Dean v. Sanders Co.*, 204 P.3d 722, 727 (Mont. 2009), as Groves concedes, this claim fails.  The Court will recommend that summary judgment be entered in

-65-

the officers' favor on this claim.

Next, the Court must analyze Groves' assault and battery claim related to the period from when the officers arrested him at the hospital on the warrant to the time Croft shot him with a taser as he attempted to escape. Groves testified at his deposition that he has no recollection of anything that occurred from the time he left the hospital to when he was at the sheriff's office – already in handcuffs and a belly chain – and then from when he was in the sheriff's office to when he woke "up in St. Vincent's [Hospital] in Billings." *Court Doc. 37-1 at 217, ll. 1-8; 218, ll. 10-25; 219, ll. 1-18*. Because he has offered no evidence of assault and battery against him during this time, the Court is left to conclude that his assault and battery claim relates only to Croft's use of a taser on him when he escaped. Because this claim is closely related to his § 1983 excessive force claim related to the taser use, the Court addresses the claims together below.

As noted, the officers advance two principal arguments challenging Groves' claim against them for use of excessive, and thus unreasonable, force stemming from their use of a taser on him. First, they argue that the force used was reasonable under the circumstances.

Second, they argue that they are entitled to qualified immunity. *Court*

*Doc. 38 at 12-16.*

The Ninth Circuit very recently in *Mattos*, *supra*,[10] restated the

standards for evaluating excessive force claims and for determining

whether qualified immunity applies in cases involving taser use. The

court stated:

> In determining whether an officer is entitled to qualified
> immunity, we employ a two-step test:  first, we decide
> whether the officer violated a plaintiff's constitutional right;
> if the answer to that inquiry is "yes," we proceed to
> determine whether the constitutional right was "clearly
> established in light of the specific context of the case" at the
> time of the events in question. *Robinson v. York*, 566 F.3d
> 817, 821 (9ᵗʰ Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194,
> 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)), *cert. denied*,
> ___ U.S. ___, 130 S.Ct. 1047, 175 L.Ed.2d 881 (2010).  The
> Supreme Court has instructed that we may "exercise [our]
> sound discretion in deciding which of the two prongs of the
> qualified immunity analysis should be addressed first."
> *Pearson*, 129 S.Ct. at 818.
>
> *        *        *
>
> For the first step – whether the official violated a
> constitutional right – we begin by looking to the Supreme

---

[10]*Mattos* involved two separate cases by women on whom police
used tasers.  The lead case, *Mattos v. Agarano*, involved use of a taser
in dart-mode.  The other case, *Brooks v. City of Seattle*, involved use of
a taser in drive-stun mode.  ___ F.3d ___, 2011 WL 4908374, at *1-4.

Court's guidance on the excessive use of force in *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

\*      \*      \*

For the second step in the qualified immunity analysis – whether the constitutional right was clearly established at the time of the conduct – we ask whether its contours were "'sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, ___ U.S. ___, ___, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). While "[w]e do not require a case directly on point, ... existing precedent must have placed the statutory or constitutional question beyond debate." *Id*.

The Supreme Court has made "clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).  We are particularly mindful of this principle in the context of Fourth Amendment cases, where the constitutional standard – reasonableness – is always a very fact-specific inquiry.  If qualified immunity provided a shield in all novel factual circumstances, officials would rarely, if ever, be held accountable for their unreasonable violations of the Fourth Amendment.  *See Deorle*, 272 F.3d at 1286 ("Otherwise, officers would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct.").  That result would not properly balance the competing goals to "hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."

*Pearson*, 129 S.Ct. at 815.

We are careful, however, to apply the "clearly established" rule in such a way that faithfully guards "'the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority.'" *Harlow*, 457 U.S. at 807 (quoting *Butz v. Economou*, 438 U.S. 478, 506, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)).  We must also allow "for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

Finally, *Graham's* general excessive force standard cannot always, alone, provide fair notice to every reasonable law enforcement officer that his or her conduct is unconstitutional.  *See Brosseau v. Haugen*, 543 U.S. 194, 198-99, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam) (explaining that *Graham* and *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), "are cast at a high level of generality" and cannot, in every case, "offer a basis for decision").  The Supreme Court has stated, however, that "in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law." *Id*. at 199 (citing *Hope*, 536 U.S. at 738).  Although this "obvious case" exception remains good law, the Supreme Court recently clarified that the bar for finding such obviousness is quite high.  In *al-Kidd*, the Court emphasized that it has "repeatedly told courts not to define clearly established law at a high level of generality.  The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."  131 S.Ct. at 2084 (citations omitted).

*Mattos*, ___ F.3d ___, 2011 WL 4908374, at *5-7.

Consistent with the foregoing authority, the Court here begins by considering the nature and quality of the force used.  In this case, as in *Mattos*, Croft fired the taser in dart mode.  The taser shot caused Groves to fall forward onto the ground resulting in blood coming from his nose, scrapes on his face and knuckles, and an apparent temporary loss of consciousness.  *Court Doc. 39 at ¶ 12; Court Doc. 40 at ¶ 11.*  The Ninth Circuit has held that such use of a taser "constitute[s] an intermediate, significant level of force."  *Mattos*, ___ F.3d ___, 2011 WL 4908374, at *12 (quoting *Bryan*, 630 F.3d at 826).  With this in mind, the Court next must consider the governmental interests at stake and ultimately whether this use of the taser was reasonable under the circumstances.

In analyzing the importance of the governmental interests at stake by first assessing the severity of the crime at issue, it is significant that Groves was escaping from the officers when Croft shot him with the taser.  Although Groves, who "was so drunk that I didn't know what was going on, *Court Doc. 37-1 at 257, ll 16-17,* now characterizes his action as merely "walk[ing] away" from the officers

and "meandering off[,]" *Id. at 191, ll. 10-15; 192, ll. 3-9*, he also testified

that he understood that someone in custody is not permitted to walk or

run away and that if the person does so, the act is an escape.  *Id. at*

*258, ll. 4-16*.  And, it is undisputed that Groves ultimately pled guilty to

a charge of escape for his action of walking away from the officers when

he was under arrest and in custody on the evening at issue.  *Id. at 255,*

*ll. 14-24*.  Because it is undisputed that Groves was in the act of

escaping from lawful custody when Croft shot him with a taser, the

Court concludes that this factor supports the amount of force used.

Groves has offered no evidence that would raise a genuine issue of

material fact on this question.

Second, as already noted above, in light of Groves' admitted level

of intoxication, head injury, and behavior, it was reasonable for the

officers to conclude, at a minimum, that Groves posed an immediate

threat of harm to himself.  Also, the fact that Groves was, at this point,

in the process of escaping from the officers' lawful custody supports the

reasonable inference that Groves posed a threat to anyone he

encountered.  In the absence of any evidence to the contrary, it is

reasonable to conclude that an individual lawfully in police custody who

is escaping poses an immediate threat to the officers, who must attempt to recapture the person, and potentially to anyone the escapee may encounter. Thus, this factor, which the Ninth Circuit deems "most important," supports the amount of force used.

Third, it is obvious and undisputed that Groves was actively attempting to resist the officers by escaping from them. Although Groves has testified that he has no recollection of what happened, the officers have stated that Croft yelled at Groves to stop. *Court Doc. 39 at ¶ 11; Court Doc. 40 at ¶ 10.* Groves ignored the officers and continued to flee from them before Croft shot him with the taser a short time later. *Court Doc. 39 at ¶ 11; Court Doc. 40 at ¶ 10.* This factor supports the amount of force used.

Finally, two other factors, which the Ninth Circuit addressed in *Mattos*, are relevant here to a proper consideration of the totality of the circumstances. *Mattos*, ___ F.3d ___, 2011 WL 4908374, at *14-15.

First, the court in *Mattos* recognized the U.S. Supreme Court's observation in *Scott v. Harris*, 550 U.S. 372, 384 (2007), that "in weighing the *Graham* governmental interests in a situation where someone is likely to get hurt – either a fleeing suspect or innocent

bystander – it is 'appropriate in this process to take into account ... relative culpability.'" *Mattos*, ___ F.3d ___, 2011 WL 4908374, at *14 (quoting *Scott*, 550 U.S. at 384). In *Mattos*, the court, in concluding that the force used was excessive, found significant the fact that the person actually shot by the police officer with a taser was "the potential non-threatening victim of the domestic dispute whom the officers ostensibly came to protect." *Id*.

In contrast, Groves was an intoxicated, belligerent, actively escaping arrestee whom the officers had been attempting to control, with limited success, for more than an hour. Groves has offered no evidence that he was not culpable in escaping.

Second, the court in *Mattos* found significant the fact that the officer gave no warning before shooting the domestic dispute victim with a taser. *Id. at *15*. The court noted that it previously had "concluded that an officer's failure to warn, when it is plausible to do so, weighs in favor of finding a constitutional violation." *Id*. (citations omitted).

Here, again in contrast to the facts in *Mattos*, it is undisputed that the officers twice verbally threatened Groves with the use of a

-73-

taser if he continued to fail to comply with their directions. *Court Doc. 39 at ¶¶ 6 and 8; Court Doc. 40 at ¶¶ 6 and 8.* It is true that the record does not reflect that they warned him of possible taser use immediately before shooting him with the taser while they were actively chasing him down an alley. But two factors render the lack of such an immediate warning insignificant.

First, the two taser warnings were given a fairly short time before Groves started his escape. And Croft did yell at Groves to stop as he was escaping. Groves ignored the direction despite already being aware that the officers had twice threatened to use a taser if he failed to comply with their directions.

Second, this case does not present a factual scenario like the one the officers in *Mattos* faced. There, all parties – police, the victim, her husband, and the couples' sleeping children – were inside the home of the couple that was engaged in a domestic dispute. *Mattos*, ___ F.3d ___, 2011 WL 4908374, at *13. A warning before firing the taser at the victim may have caused her to comply with the officer's direction at the scene. Here, on the other hand, the parties were outside with the officers chasing Groves down an alley at night. In light of the apparent

lack of effect the officers' prior two taser warnings had on Groves up to that point, it is unlikely that a renewed warning given as they chased him down the alley would have made a difference in his behavior. Groves has presented no evidence that would raise a genuine issue of material fact with respect to this issue.

For all of the foregoing reasons, the Court concludes that the amount of force used was not constitutionally excessive under the circumstances.  No genuine issue of material fact exists on the issue thus rendering summary judgment in the officers' favor appropriate on Groves' § 1983 claims against them.

The foregoing discussion also compels the Court to conclude that summary judgment in the officers' favor is appropriate with respect Groves' claims for assault and battery related to use of the taser on him.  Under Montana law, "a peace officer ... who has an arrested person in custody is justified in the use of force to prevent the escape of the arrested person from custody that the officer ... would be justified in using if the officer ... were arresting the person."  MCA § 45-3-106. Here, as already noted in the foregoing discussion, the amount of force that the officers used to capture an actively escaping Groves was not

constitutionally excessive.  Thus, under the statute quoted, they were justified in using force to capture Groves as he escaped.

Despite the foregoing conclusions, the Court deems it appropriate also to address the second step in the qualified immunity analysis – whether the officers violated clearly established law when they shot Groves with a taser.  The Court concludes that they did not and that they are entitled to qualified immunity on this basis as well.

Assuming for purposes of this analysis that the force the officers used against Groves was excessive under the Fourth Amendment, the Court next must determine whether the constitutional violation was "'sufficiently clear' that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'" *Id*. at *15 (quoting *al-Kidd*, 131 S.Ct. at 2083 (quoting *Anderson*, 483 U.S. at 640)).  In *Mattos*, the court concluded that, as of August 2006, the alleged constitutional violation was not clearly established because, "[a]t the time, 'there was no Supreme Court decision or decision of [the Ninth Circuit] addressing' the use of a taser in dart mode."  *Id*. (quoting *Bryan*, 630 F.3d at 833)).  Also, the court in *Mattos* concluded that "the violation was not so obvious that we can rely on the *Graham* factors

-76-

and define the contours of clearly established law at a high level of generality." *Id*. (citing *al-Kidd*, 131 S.Ct. at 2084).

*Mattos* controls here. As of the date the officers shot Groves with a taser in dart mode in Red Lodge – April 28, 2007 – no U.S. Supreme Court or Ninth Circuit decision addressed the use of a taser in dart mode. *See Bryan*, 630 F.3d at 833 (decided November 30, 2010). Thus, the law was not sufficiently established at the time to put the officers on notice that their conduct might violate clearly established law. And, as in *Mattos*, any violation "was not so obvious that [the Court] can rely on the Graham factors and define the contours of clearly established law at a high level of generality." *Mattos*, ___ F.3d ___, 2011 WL 4908374, at *16 (citing *al-Kidd*, 131 S.Ct. at 2084). Thus, Neibauer and Croft are entitled to qualified immunity on this basis as well.

## IV.   <u>CONCLUSION</u>

Based on the foregoing, IT IS ORDERED that:

1.   Red Lodge's motion to exclude Groves' expert, Ron Tussing, from testifying on specific issues (*Court Doc. 28*) is GRANTED; and

2.   Groves' motion to exclude Defendants' expert, Kevin Sailor, from testifying on specific issues (*Court Doc. 42*) is DENIED;

Also, IT IS RECOMMENDED that:

1.    Red Lodge's motion for partial summary judgment (*Court Doc. 31*) be GRANTED; and

2.    Croft's and Neibauer's motion for summary judgment (*Court Doc. 36*) be GRANTED.

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy of the Findings and Recommendation of United States Magistrate Judge upon the parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendation must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after service hereof, or objection is waived.

DATED this 10th day of November, 2011.


/s/ Carolyn S. Ostby
United States Magistrate Judge